IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 15, 2011 Session

STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES
v. MISTY BYRD

IN THE MATTER OF:
MORGAN R., DOB 12/14/02
BRADEN R., DOB 6/22/05
ZAKARY R., DOB 9/23/08

Direct Appeal from the Circuit Court for Tipton County
No. 6668      J. Weber McCraw, Judge

No. W2011-01249-COA-R3-JV - Filed February 17, 2012

This appeal arises out of dependency and neglect proceedings regarding three minor children. The circuit court found all three children dependent and neglected, and it found the youngest child had been severely abused. We affirm.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

J. Thomas Caldwell, Ripley, Tennessee, for the appellant, Misty Byrd

Robert E. Cooper, Jr., Attorney General and Reporter, Shanta J. Murray, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services

# OPINION

## I.  FACTS & PROCEDURAL HISTORY

Misty Byrd ("Mother") is the mother of three minor children: Morgan R. (dob 12/14/02), Braden R. (dob 6/22/05), and Zakary R. (dob 9/23/08).  Mother was previously married to Christopher R., the biological father of Morgan and Braden, but the couple divorced in 2007.  The biological father of Zakary is unknown.[1]

After her divorce from Christopher R., Mother and the children moved into her mother's home.[2]  However, on March 27, 2009, Mother married Ray Byrd, a four-time convicted felon,[3] and she and the children moved into Mr. Byrd's home.

According to Mother, when Zakary was nine days old he began experiencing "fainting episodes" where he would cry uncontrollably for approximately twenty minutes before his lips would turn blue and he would "just go limp" and become "unresponsive."  Zakary allegedly suffered from five or six of these "episodes," and Mother sought medical attention for him, but no cause for such was identified.

On May 4, 2009, Mother left Braden and seven-month-old Zakary in the care of Mr. Byrd for "maybe an hour" while she retrieved Morgan from school.  Braden had never been left alone with Mr. Byrd "because he was so attached to [Mother]" and Zakary had only been left alone with Mr. Byrd on one prior occasion for fifteen minutes.  On May 4, Mother allegedly returned home to find Zakary "acting perfectly fine[.]"  However, moments later when Mr. Byrd attempted to place Zakary in an exersaucer toy, Zakary allegedly suffered an "episode" and "fell limp[,]" hitting his head on the toy while Mr. Byrd held his legs.  Unsure how to react, Mr. Byrd telephoned his grandmother who lived a short distance away.  Pursuant to his grandmother's advice, a damp rag was placed on Zakary's face.  However, when a bruise appeared on Zakary's face, Mother and Mr. Byrd drove Zakary to Baptist Memorial Hospital - Tipton ("Baptist").

---

[1]Mr. Byrd initially stated that there was a "very small chance" that he is Zakary's father, but he also stated that Zakary's father is "a dopehead in Arkansas."  However, Mother testified that Mr. Byrd is one of two potential fathers of Zakary.

[2]From the time of his 2007 divorce from Mother until 2009, Christopher R. exercised alternating weekend visitation with Morgan and Braden.

[3]The felonies include sexual assault, burglary, and two counts of theft.  With regard to the sexual assault conviction, Mr. Byrd stated that "[the victim] was 17 and I was 22."

At Baptist, a head CT scan and a posterior to anterior (PA) chest x-ray were performed. No rib fractures or evidence of traumatic injury was identified. According to Mother, Baptist intended to discharge Zakary with pain medication, but Mother requested that Zakary be taken to LeBonheur Children's Hospital ("LeBonheur") for further evaluation concerning his "breathing episodes."

Zakary was transported to LeBonheur via an ambulance, and Mother and Mr. Byrd arrived some time later. At LeBonheur, a computerized tomography scan of Zakary's abdomen and pelvis was performed as well as a skeletal survey. The computerized tomography scan "was significant for multiple right-sided rib fractures in various stages of healing, multifocal liver lacerations, grade 2 lacerations with an anterior subcapsular hematoma anterolaterally and superiorly." The skeletal survey "was significant for healing fractures, subacute and chronic involving the right ribs, right femur, right fibula, right radius and right ulna." LeBonheur physicians noted "multiple bruises, which are purple and red along the right eye and forehead[,]" "bruising to the right side of the face and the top of the right head[,]" "a laceration of the frenulum and bruising to the upper lip[,]" "some subconjunctival hemorrhage in the right eye[,]" "a yellow brown bruise . . . on the left cheek[,]" "yellow brown" bruising on the abdomen, and "an abrasion to the bottom of the right foot." LeBonheur physicians assessed Zakary's injuries as "inconsistent with the history that was given and [as] suspicious for nonaccidental trauma, most likely repeated episodes of blunt force trauma."

As a result of these injuries, Zakary was hospitalized for eight days in the LeBonheur Pediatric Intensive Care Unit. He was referred to a LeBonheur social worker and later, to the Tennessee Department of Children's Services ("DCS"). After receiving the referral, DCS Investigator Robin Gravely "immediately called law enforcement" and together with Detective Chris Williams of the Tipton County Sheriff's Office, began an investigation into the circumstances surrounding Zakary's injuries.[4] A child and family team meeting was held on May 7, 2009, in which it was determined that custody of Zakary should be transferred to Mother's sister, Chrystal Walk, and her husband, Robert Walk. Shortly thereafter, "due to the severity of Zakary's injuries," DCS determined that Morgan and Braden should be placed with their father.

On May 13, 2009, DCS filed a "Petition to Adjudicate Dependency and Neglect" against Mother in the Tipton County Juvenile Court regarding all three children. That same day, the juvenile court entered a "Protective Custody Order" finding probable cause to believe that the children were dependent and neglected, and temporarily awarding custody

---

[4]According to Mother, she and Mr. Byrd were criminally charged for Zakary's injuries, but they were acquitted after a jury trial.

of Morgan and Braden to their father, and of Zakary to Mr. and Mrs. Walk. Following a hearing on October 14, 2009, the juvenile court entered an order on February 12, 2010, adjudicating all three children dependent and neglected and finding that Zakary was the victim of severe child abuse perpetrated by Mother, Mr. Byrd, or both. The court ordered that temporary custody of Morgan and Braden remain with their father and that temporary custody of Zakary remain with Mr. and Mrs. Walk. Mother was afforded supervised visitation with the children, but Mr. Byrd was ordered to have no contact with them.

Mother appealed to the Tipton County Circuit Court, and a hearing was held on February 3 and March 23, 2011. At the hearing, Lisa Piercey, MD, an expert in pediatrics and child abuse who examined all three children in May 2009, testified on behalf of DCS. Dr. Piercey described the patient history received as "somehow in the course of putting the baby into an exer[saucer] . . .the baby blacked out and hit his head/face on the toy." She explained that she had reviewed the medical records from Baptist and LeBonheur; however, she stated that she examined Zakary, conducted a follow-up skeletal survey, and rendered her own report prior to reviewing such records. She then testified regarding the contents of her medical report:

> The [follow-up] skeletal survey . . . showed healed fractures of the distal right radius and ulna . . . the right mid-femur . . . and the distal right tibia and fibula . . . ; he also had healed fractures of two of his ribs in the back, No. 9 and 10. . . . [M]y assessment was: Severe child abuse, and I opined that the proposed mechanism is completely inconsistent with the injuries seen. Multiple fractures would not be encountered in the routine care of the child, nor could the child have inflicted these injuries upon himself. I noted that this trauma would require the force and co-ordination of an adult, and additionally, there were no accidental or medical conditions to explain these findings.

She explained, concerning the metaphysical fractures of the radius and ulna, that "[t]he metaphysis is an unusual spot to have fractures and typically conn[otes] a very specific mechanism and that mechanism is almost always a pulling or a yanking." Additionally, she testified that "[t]hose types of fractures are not found from falling off something, rolling off something, not in car wrecks, not in those kind of things; it's a very specific mechanism. . . . [I]t's a very highly specific fracture for child abuse and is very, very rarely found in any other circumstances."

Regarding Zakary's fractured ribs, she stated that "[p]osterior [rib] fractures are, again, very highly uncommon in accidental mechanisms because of their relatively protected location." "[I]t's widely supported that these are very, very highly specific fractures for abusive trauma from front to back compression. . . . So again, those are supportive of very

highly specific finding for abusive trauma." She agreed that two vertebral fractures and compression fractures of Zakary's spine indicated on the LeBonheur MRI were "consistent with severe child abuse" and that such fractures "are very classic in infants from when they're slammed down on their bottom[.]" Likewise, she stated that liver lacerations are typically caused by "blunt force trauma to the abdomen . . . in infants and toddlers . . . from getting sucker-punched in or kicked in the belly." She noted that Zakary had a "tear of the upper lip frenulum, which is very significant for inflicted trauma[,]" as such tears typically occur "when [a child is] punched or hit in the mouth very forcefully" or is "forcefe[d.]" She explained that "pinna bruising–bruising of the ear–is also very highly specific for inflicted trauma." Furthermore, she testified that "multiple fractures in any child, particularly infants . . . is very highly specific for inflicted trauma."

Concerning the plausibility of Zakary's extensive injuries occurring from a single fall from an exersaucer toy, Dr. Piercey explained that "the only thing that could be consistent with the history provided was that of facial bruising[,]" but that "the facial bruising was still very extensive based on the records reviewed." Moreover, "[t]here was absolutely no history to explain the rib fractures, the fractures of the arm, the fractures of the leg, and there was notation in the LeBonheur records about him having . . . multiple liver lacerations, and there was certainly nothing in the history to explain significant abdominal trauma." Consistent with her medical report, she testified that such injuries would not occur in the everyday normal care and control of a child, and that neither Zakary, nor a three-year-old child, could have inflicted the injuries.

Dr. Piercey testified that Zakary was tested for metabolic disorders "that would cause bleeding tendencies [or] excessive injuries from minor trauma[.]" He was also tested for "things like brittle bone disease and rickets, things that would cause his bones to break more easily than the normal child, and he had no evidence of any of those."

Dr. Piercey also explained the discrepancies between the findings of Baptist–which revealed no internal injuries–and those of LeBonheur. She found the disparities "relatively common [for] what we see from outlying hospitals." She stated that Baptist made a "very suboptimal examination" in performing only two radiologic studies: a head CT and a PA chest x-ray. The Baptist head CT was normal, consistent with what was found at LeBonheur. However, the chest x-ray was also considered normal at Baptist, and this, according to Dr. Piercey is "a common mistake that people, facilities that aren't used to seeing children make, in that they don't get films that would typically show rib fractures." She stated that "infants in particular, the angle of the ribs and those posterior fractures in the back are almost never seen in an AP or PA front to back views . . . . So they didn't see them in their one view at Baptist Tipton, which doesn't surprise me. That's why we order additional views at specialized children's hospitals."

In conclusion, Dr. Piercey assessed Zakary's injuries as "severe physical abuse" based on their being "potentially life-threatening or permanently life-altering." She noted that the injuries were in various stages of healing and that at least three separate injurious incidents could be delineated. She found the injuries to be "completely inconsistent" with a short fall, and instead maintained that the injuries were "very highly consistent with nonaccidental trauma."

Detective Chris Williams and DCS Investigator Robin Gravely also testified at the hearing on behalf of DCS. Det. Williams described "some discrepancies" between the initial statements he took from Mother and Mr. Byrd on May 5, 2009, and the written statements he took from both on May 8. He stated that

Initially when we spoke to Mrs. Byrd she had told us that Mr. Byrd was the father, matter of factly, and then, of course, when we spoke to him he said that no, he wasn't the father, and then when they came in for the May 8 interview again, who the father was, who the father wasn't it was still up in the air. That was one discrepancy.

The next would be during the initial statements when we first talked to them, Mrs. Byrd - - actually both of them but Mrs. Byrd specifically, was telling me where she had been and what she had done that day and she said that she had gone to [Mr. Byrd's grandmother's] house [after picking up Morgan from school] and that [Mr. Byrd's grandmother] wasn't home and so she went home. And at the time I had no reason to question it. However, later on May 8 after some additional information had come out, she changed her story to, [Mr. Byrd's grandmother] was home and that she had spent, I think she said, fifteen minutes there and she was trying on a dress and a girdle.

He also testified that on May 5 and May 8, Mother and Mr. Byrd had described the distance of Zakary's fall as "approximately four to six inches," which he stated was inconsistent with their testimony at trial of falling "a significantly further distance[.]"[5] Finally, Det. Williams testified that he was told by Mother and Mr. Byrd that the exersaucer toy would have blood on it, but that an examination of the toy, which had not been tampered with or touched, revealed no "visible blood" at the alleged impact location and a swab test of that location

---

[5]Det. Williams also stated that on May 5 he had Mother and Mr. Byrd demonstrate on video "exactly how the fall happened" and he testified that these prior demonstrations differed from their in-court demonstrations. A video of the prior demonstrations is included in the record before us. However, it provides little assistance as the file containing Mr. Byrd's demonstration cannot be opened, and Mother's demonstration contains no sound.

"revealed negative presence of blood."[6] Likewise, DCS Investigator Gravely testified that she examined the exersaucer toy and saw no blood.

Mother testified that at the time of the incident she was working very little, one day a week or less. She was Zakary's primary caregiver, but when she was working, Zakary stayed with an immediate family member. Mother recounted Zakary's three to four "episodes" prior to the May 4 incident, and then she described the events of May 4. Mother did not work that day and had stayed home with the children. Zakary and Braden had been "fussy," but Zakary was sleeping when she left to retrieve Morgan from school. After picking up Morgan, Mother went to Wal-Mart and then stopped by Mr. Byrd's grandmother's house for "[p]robably [fifteen] minutes." When Mother returned home after being gone "maybe an hour[,]" Zakary was acting "fine[.]" Mother described Zakary's alleged fall as follows:

> [Mr. Byrd] went to put him in the toy and he had another episode. . . . [H]e fell over, fell limp, and he did fall on the toy. I didn't black out, I saw him fall on the toy.
>
> So - - and then [Mr. Byrd] picked him up and then I got him from [Mr. Byrd] and was trying to look at him to see if there was anything, and at the time there was no bruising or anything but I was still concerned. . . . [W]e didn't see anything, other than the blood from his mouth[.]
>
> . . . .
>
> [Mr. Byrd] was just holding him and he went limp and he was still partially holding on - - when he slipped he still had like his feet . . . .

She testified that Zakary was "[m]aybe a couple" of feet above the exersaucer toy when he fell. In her written statement, Mother stated that after the fall Zakary did not cry immediately, but "[a]fter about [ten] seconds or so [he] started crying."

When confronted with the evidence of Zakary's injuries, Mother agreed that she "ha[d] no idea" how such injuries were sustained. She stated that the only injury-causing event she witnessed was Zakary's fall from the exersaucer toy, that she had never injured her children, and that she "[w]ould [not] stand for it . . . if [she] saw somebody trying to injure [her] children." Finally, Mother testified that she "know[s] for a fact [Mr. Byrd] didn't

[6]However, one "small head of a pin size" spot on the back of the toy's seat was tested and did indicate the presence of blood.

[injure Zakary] because [she] was there[,]" and that she is "very positive that [Mr. Byrd] did nothing to these children."

Mr. Byrd also provided an account of the events of May 4:

I was placing him in a seat, toy ExerSaucer, and I had one hand around his waist, the other one I had his ankle trying to guide his foot into the holes in the seat, and he just fell over and went limp and it shocked me. I didn't have enough time to react to try to catch him, and we were probably a couple feet up because I had just repositioned my arm to grab his leg with my hand.

. . . .

It took a minute to realize what happened and as soon as I did I immediately lifted him back up and he had a little bit of blood on his mouth. He never once cried, never - - just had this look on his face like he wasn't home and then it didn't take long until he was back.

Like Mother, Mr. Byrd testified that, during the fall, Zakary never left Mr. Byrd's hands. Mr. Byrd testified that he had never intentionally injured any child, and when asked to explain the various stages of Zakary's injuries, he simply responded that pre-May 4 injuries did not exist.

Mr. Byrd's May 8, 2009 written statement was also introduced into evidence, and it provided further details that following Zakary's fall, Mr. Byrd "felt like [he] was going to black out because of the blood from [Zakary's] mouth" and that the incident caused him to "freak[] out." Moreover, in his written statement, Mr. Byrd stated that "[e]veryone who has watched [the children] has told us about incidents involving Braden and Zakary[,]" but he insisted that he was "not trying to blame [Zakary's injuries] on the other kids especially Braden but we know we are not beating our baby." He theorized that Zakary may have a genetic condition which causes extremely fragile bones, and he alleged that Zakary has the symptoms of such–an abnormally large head, bulging eyes, and pale skin.

Mother's sister, Chrystal Walk, who had been caring for the children since May 2009, testified that Zakary has had no broken bones or "episodes" since he had been in her home. Christopher R. testified that he believes Mother's home is unsafe.

At trial, Mother presented character witnesses. Mother's aunt testified that she had witnessed a "lifeless" Zakary as he was "coming out" of "one of his spells[.]" She also testified that Mother was "very protective, loving" and "devoted" to her children, and that

Mr. Byrd was "good to [the children.]" Mr. Byrd's uncle similarly testified that Mr. Byrd treated the children "very well" and that they were "always clean and happy, play[ing], excited."

Following the presentation of much evidence and the testimony of numerous witnesses, the circuit court concluded that all three children were dependent and neglected, and that Zakary was the victim of severe abuse. The circuit court specifically credited the testimony of expert witness Dr. Lisa Piercey, and it found Mother's and Mr. Byrd's testimony to be "neither reasonable nor credible."

In its order, the trial court made the following relevant findings of fact and conclusions of law:

> As a matter of record, the Court found that the child, Zakary R[.], sustained injuries. That there were injuries to Zakary's full body, including, but not limited to his head, face, ribs, wrists, legs, and that he had liver lacerations and bruising.
>
> The Court also found that the injuries sustained by the child were inconsistent with the explanation given by [Mother] and her husband, Ray Byrd. Further, the Court found that Mr. Byrd and [Mother] did not offer any reasonable explanation for the severe child abuse and that the injuries sustained by Zakary were very suggestive of non-accidental trauma.
>
> The Court found that Zakary's injuries were unexplained and were uncommon for accidental trauma. The Court found that while Zakary's facial bruising could be consistent with a drop or fall of a short distance that struck a toy, however, the same said drop or fall could not explain the other injuries throughout Zakary's full body.
>
> The Court found that Zakary's injuries occurred at the time when the child was with both Mr. Byrd or [Mother] and as such the child's injuries were either caused by Mr. Byrd or [Mother] or that the injuries occurred during their (Mr. Byrd's and [Mother's]) reckless conduct or their (Mr. Byrd and [Mother]) knowing disregard of such abusive actions.

Accordingly, the circuit court found that custody of Morgan and Braden should remain with their father, and that custody of Zakary should remain with Mr. and Mrs. Walk. Mother was allowed supervised visitation, and again, Mr. Byrd was ordered to have no contact with the children. Mother timely appealed to this Court.

## II. ISSUES PRESENTED

Mother presents the following issues for review, as summarized:

1. Whether the circuit court[7] erred in finding Zakary was injured while he was "with" Mother;

2. Whether the circuit court erred in finding Mother was guilty of knowing or reckless disregard for the abusive actions of Mr. Byrd;

3. Whether the circuit court erred in finding Zakary's injuries were unexplained for accidental trauma; and

4. Whether the circuit court erred in finding clear and convincing evidence that Morgan and Braden were dependent and neglected.

For the following reasons, we affirm the decision of the circuit court.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. **Tenn. R. App. P. 13(d)** (2010); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC*, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Id.* We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp.*

---

[7]The juvenile court proceedings are part of the appellate record. However, pursuant to Tennessee Code Annotated section 37-1-159, Mother received a *de novo* dependency and neglect hearing before the circuit court. Mother appeals from the circuit court's findings and order.

***v. Huddleston****,* 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.,* 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).


## IV. DISCUSSION

"A biological parent's right to the care and the custody of his child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." ***In re Samaria S.****,* 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011) (citing *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *In re Giorgianna H.*, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006)). This right, however, is not absolute. *Id.* (citing *DCS v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004)). "It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.* at 200-01 (citing *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004)).

One situation in which the rights of a biological parent may be limited is where a child has been deemed dependent and neglected. *Id.* at 201. A "dependent and neglected child," as relevant to this case, is a child:

> Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others; [or]
> . . . .
> Who is suffering from abuse or neglect[.][8]

**Tenn. Code Ann. § 37-1-102(b)(12)(F), (G)**. "'Parents have a duty to provide, and children have a corresponding right to be provided with a safe environment, free from abuse and neglect.'" *Id.* (quoting *In re R.C.P.*, M2003-01143-COA-R3-PT, 2004 WL 1567122, at *6 (Tenn. Ct. App. July 13, 2004)). "The primary purpose of dependency and neglect proceedings 'is to provide for the care and protection of children whose parents are unable or unwilling to care for them.'" *Id.* (quoting *DCS v. M.S.*, No. M2003-01670-COA-R3-CV,

---

[8]In its brief to this Court, DCS also cites the dependency and neglect ground of "cruelty, mental incapacity, immorality or depravity" of the person with whom the child lives. However, it does not appear that this ground was raised in the trial court, and therefore, we will not consider it on appeal.

2005 WL 549141, at *9 n.11 (Tenn. Ct. App. Mar. 8, 2005)).[9]

When the ground for a dependency and neglect petition is "abuse and neglect[,]" Tenn. Code Ann. § 37-1-102(b)(12)(G), the court shall determine whether the parents have committed severe child abuse.[10] **Tenn. Code Ann. § 37-1-129(a)(2)**. As relevant to this case, "severe child abuse" means:

(A)(I) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury[11] or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

. . . .

(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;

(C) The commission of any act towards the child prohibited by § . . . 39-15-402 [aggravated child abuse and neglect] . . . or the knowing failure to protect the child from the commission of any such act towards the child[.]

**Tenn. Code Ann. § 37-1-102(b)(23)**.

---

[9]"'Children who are found to be dependent and neglected are frequently removed from their parents'[] custody and placed in the custody of [DCS]. If the parents' conduct that precipitated the dependent and neglect proceeding is sufficiently serious, a finding of dependency and neglect may be the foundation for a proceeding to terminate the parents' parental rights.'" *In re Samaria S.*, 347 S.W.3d at 201 (quoting *In re Gaven R.*, No. M2005-01868-COA-R3-CV, 2007 WL 2198288, at *7 (Tenn. Ct. App. July 23, 2007)).

[10]The court may make a severe child abuse determination regardless of the grounds alleged in the dependency and neglect proceeding. **Tenn. Code Ann. § 37-1-129(a)(2)**.

[11]"'Serious bodily injury to the child'" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." **Tenn. Code Ann. § 39-15-402(d)**.

-12-

As stated above, the circuit court found that all three children were dependent and neglected, that Zakary had been severely abused, and that Zakary's injuries were either caused by Mother or that she had recklessly or knowingly disregarded Mr. Byrd's abusive actions towards Zakary.

### 1. Actions of Mother

On appeal, Mother argues that the circuit court erred in finding that Zakary was either injured while he was "with" her or that she had knowingly or recklessly disregarded Mr. Byrd's abusive actions. Additionally, she argues that the circuit court erred in finding that Zakary's injuries were unexplained for accidental trauma. Mother provides little "argument" to support these assertions, but she seems to suggest that many of Zakary's injuries were either fabricated by DCS or erroneously misdiagnosed at LeBonheur. She points out that the x-rays taken at Baptist indicated no injury, and she argues that she "could not be expected to recognize injury when trained professionals could not discern same by x-ray." She seems to suggest that all of Zakary's injuries stemmed from the alleged May 4 fall, and that her actions in obtaining medical care for Zakary preclude a finding of knowing failure to protect him.

A finding of severe child abuse must be supported by clear and convincing evidence.[12]

---

[12]A finding of severe child abuse has serious ramifications:

> A finding of severe abuse triggers other statutory provisions, including a
>
> prohibition on returning the child to the home of any person who engaged in or knowingly permitted the abuse absent consideration of various reports and recommendations. Tenn. Code Ann. § 37–1–130(c). Even with such consideration,
>
>> No child who has been found to be a victim of severe child abuse shall be returned to such custody at any time unless the court finds on the basis of clear and convincing evidence that the child will be provided a safe home free from further such brutality and abuse.
>
> Tenn. Code Ann. § 37–1–130(d). Further, Tenn. Code Ann. § 37–1–130(g)(4)(A) provides that reasonable efforts to reunify a family are not required to be made if a court has determined that a parent has subjected the child or a sibling to severe child abuse.
>
> The most serious consequence of a finding that a parent has committed

(continued...)

*See Dep't of Children's Servs. v. David H.*, 247 S.W.3d 651, 655 (Tenn. Ct. App. 2006) (citing *Dep't of Children's Servs. v. M.S. & J.S.*, No. M2003-01780-COA-R3-CV, 2005 WL 549141 (Tenn. Ct. App. Mar. 8, 2005) *perm. app. denied* (Tenn. Aug. 29, 2005)). However, direct evidence that Mother actively engaged in or witnessed abuse of her children is not necessary to find that she is guilty of severe child abuse and that the children are dependent and neglected. *In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009). "[A] parent who has not directly abused her own child may still be found to have committed severe child abuse if she 'knowingly exposed the child to, or knowingly failed to protect the child from, conduct constituting severe child abuse.'" *Id.* (quoting *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *6 (Tenn. Ct. App. July 13, 2004)).

"Knowing" and "knowingly" are not defined in Tenn. Code Ann. § 37-1-102, or in any other statute pertaining to dependency and neglect proceedings to terminate parental rights or in other civil proceedings involving juveniles. "The words 'knowing' and 'knowingly' do not have fixed or uniform meanings, and their meanings vary depending on the context in which they are used or the character of the conduct at issue."

A parent who is present when a child is abused but who fails to intervene to protect the child has knowingly exposed the child to, or has failed to protect the child from, abuse. The "knowing" requirement in Tenn. Code Ann. § 37-1-102 (b)(21), however

is not limited to parents who are present when severe abuse

---

[12](...continued)
severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights. Tenn. Code Ann. § 37–1–130(g)(4) ("the parent or guardian has been found to have committed severe child abuse as defined in § 37–1–102, under any prior order of a court.") The ground itself is proved by a prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.

*M.S.*, 2005 WL 549141, at *10. Thus, if there is a finding of severe child abuse, under the statutes, DCS is relieved of the obligation to use reasonable efforts to reunify the child with the parent, it is more difficult for the parent to regain custody, and one ground for termination of the parent's parental rights is effectively established.

*In re Samaria S.* 347 S.W.3d at 201.

actually occurs. A parent's failure to protect a child will also be considered 'knowing' if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur.

Accordingly, a parent's conduct is "knowing, and a parent acts or fails to act 'knowingly,' when . . . she has actual knowledge of the relevant facts and circumstances or when . . .she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to . . . her."

*Id.* (internal citations and footnotes omitted).

On appeal, Mother contends that Zakary sustained injuries only on May 4, and that these injuries were the result of an accidental fall from his exersaucer toy. The overwhelming medical evidence in this case reveals otherwise. As set out above, LeBohneur physicians found "multiple right-sided rib fractures in various stages of healing, multifocal liver lacerations," "healing fractures [of the] . . . right ribs, right femur, right fibula, right radius and right ulna[,]" and "yellow brown" bruising of the cheek and abdomen. These injuries were assessed as "inconsistent" with the reported exersaucer fall and "most likely [from] repeated episodes of blunt force trauma." Mother testified that she was present when Zakary was injured on May 4, and it is undisputed that she was his primary caregiver during the time period in which he sustained prior facial and abdominal bruises and multiple broken bones.

Additionally, Dr. Piercey, whom the trial court specifically found credible, testified that her follow-up skeletal survey revealed "healed fractures of the . . . right radius and ulna . . . the right mid-femur[,] the [] right tibia and fibula[, and] two of his ribs[.]" She noted that multiple fractures are "very highly specific for inflicted trauma[,]" and she opined that Zakary's injuries would not have occurred in his routine care, that Zakary nor his siblings could have caused the injuries, and that the trauma would require the "force and co-ordination of an adult." She testified that the exersaucer toy could not have caused the extensive injuries to Zakary, which occurred in at least three separate incidents, and she found "absolutely no history to explain the rib fractures, the fractures of the arm, the fractures of the leg, . . . [or the] significant abdominal trauma." She noted that Zakary tested negative for disorders causing "excessive injuries for minor trauma" and she ultimately assessed his injuries as "severe child abuse." She also testified regarding the discrepancies between the findings of Baptist and LeBonheur. She was not "surprise[d]" that Baptist's "suboptimal examination" revealed no injuries because the x-ray views taken there "almost never" reveal

the types of fractures Zakary sustained.

Based upon the abundant evidence before us, we affirm the trial court's conclusion that Zakary's injuries were not simply the result of an accidental fall from a toy. Moreover, considering the magnitude of Zakary's injuries, and Mother's near-constant contact with him, we find, at a minimum, that Mother "should have recognized that severe child abuse had occurred[.]" *In re H.L.F.*, 297 S.W.3d at 236 (citations omitted). Accordingly, despite the absence of direct evidence of abuse by Mother, we find clear and convincing evidence to affirm the trial court's finding that Zakary's injuries occurred while he was with Mother, that the injuries were caused by either Mr. Byrd or Mother, and that the non-abuser knowingly or recklessly disregarded the other's abusive actions.[13]

### 2.  Morgan and Braden

On appeal, Mother also argues that the circuit court erred in finding Morgan and Braden were dependent and neglected, as she maintains that there was no evidence presented to support such a finding. Mother correctly points out that Christopher R. testified that Morgan and Braden are doing well in school, and that the medical record from Dr. Piercey's examination of them in May 2009 revealed no evidence of physical or sexual abuse.

However, our finding that Zakary was severely abused is sufficient to render Morgan and Braden dependent and neglected notwithstanding the apparent lack of physical abuse toward them. By perpetrating severe abuse against Zakary or willingly placing her children in a home where she should have recognized that abuse was occurring, Mother provided "improper guardianship or control so as to injure *or endanger* the morals or health" of Morgan and Braden, so as to render them dependent and neglected pursuant to Tennessee Code Annotated section 37-1-102(b)(12)(F). (emphasis added). The severe abuse against Zakary provides clear and convincing evidence to support this finding, and Mother's assertions to the contrary are without merit.

---

[13]That Mother sought medical attention for Zakary does not preclude a finding of severe child abuse. As the middle section of this Court noted in *State, Dept. of Children's Services v. H.A.C.*, No. M2008-01741-COA-R3-JV, 2009 WL 837709, at *4 (Tenn. Ct. App. Mar. 26, 2009), "child abuse is not excused by promptly seeking medical attention for the abused child."

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court. Costs of this appeal are taxed to Appellant, Misty Byrd, and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.